

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-6-2000

# Breyer v. Meissner

Precedential or Non-Precedential:

Docket 98-1842

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Breyer v. Meissner" (2000). *2000 Decisions.* Paper 122.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/122

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 6, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1842

JOHANN BREYER,
        Appellant

v.

DORIS MEISSNER, U.S. IMMIGRATION AND
NATURALIZATION SERVICE

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 97-cv-06515)
District Judge: Honorable William H. Yohn, Jr.

Argued: April 27, 1999

Before: SCIRICA, ROTH and MCKAY1, Circuit Judges

(Filed: June 6, 2000)

_____

1. Honorable Monroe G. McKay, Circuit Judge, United States Court of
Appeals for the Tenth Circuit, sitting by designation.

           Willan F. Joseph, Esquire (Argued)
           1831 Chestnut Street, Suite 1001
           Philadelphia, PA 19103

            Attorney for Appellant

           David W. Ogden Acting
            Assistant Attorney General
           Civil Division
           Karen F. Torstenson
           Assistant Director
           Gretchen M. Wolfinger, Esquire
            (Argued)
           United States Department of Justice
           Office of Immigration Litigation
           P.O. Box 878
           Ben Franklin Station
           Washington, DC 20044

            Attorneys for Appellee

OPINION OF THE COURT

ROTH, Circuit Judge.

This case involves the interpretation of our immigration laws as they apply to Johann Breyer, a naturalized citizen who claimed, when faced with denaturalization, that he had been entitled to American citizenship by birth through his American-born mother. The statutes governing Breyer's claim to citizenship are S 1993 of the Revised Statutes of 1874 and a 1994 amendment to the Immigration and Naturalization Act ("INA"), S 101(c)(2) of the Immigration and Nationality Technical Corrections Act ("INTCA"). In our review, we consider whether these provisions discriminated against Breyer's mother on the basis of gender, in violation of the equal protection clause of the Fifth Amendment to the Constitution. Because we find that they did discriminate against the mother, we must then determine what effect Breyer's subsequent actions during World War II had on his claim to American citizenship.

2

## I. Factual Background

Johann Breyer was born in Czechoslovakia on May 30, 1925, to an American mother and a foreign father. [2] As a young man, Breyer joined the Waffen SS, a Nazi paramilitary group, and ultimately became a member of the SS Totenkopfsturmbanne (Death's Head Battalion). As a member of the Death's Head Battalion, Breyer guarded concentration camps where inmates were enslaved, tortured, and executed because of race, religion, national origin, or political beliefs.

Breyer served at the Buchenwald concentration camp, in the Death's Head Battalion guard unit, from February 1943 to May 1944. At Buchenwald, Breyer accompanied prisoners to and from work sites and stood guard with a loaded rifle at the perimeter of the camp with orders to shoot any prisoner who tried to escape. In May of 1944, Breyer was transferred to the Auschwitz death camp, where he performed the same duties as he had at Buchenwald. In August of 1944, Breyer took a paid leave from his duties at Auschwitz and never returned to the camp.

While he denies that he personally tortured or murdered prisoners at Buchenwald and Auschwitz, Breyer does not now deny that he served in the Death's Head Battalion. In May of 1951, however, when Breyer applied for a visa to immigrate to the United States under the Displaced Persons Act of 1948, Pub. L. No. 80-774, 62 Stat. 1009, as amended by Pub. L. No. 81-555, 64 Stat. 219 (1950) ("the Act"),[3] he

_____

2. As we explain infra, after a bench trial, the District Court found that Breyer's mother was, in fact, an American citizen. Although we vacated the District Court's decision on other grounds, we take judicial notice of its earlier finding concerning Breyer's mother. Moreover, we note that the court's finding is consistent with allegations contained in Breyer's pleadings, which we accept as true on review of a dismissal under Fed. R. Civ. P. 12(b)(6).

3. In pertinent part, the Displaced Persons Act makes ineligible for admission to the United States,

> any person . . . who is or has been a member of or participated in any movement which is or has been hostile to the United States or the form of government of the United States, or to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin.

3

did not disclose that he had served in the Death's Head Battalion. Breyer did, however, admit to having been a member of the Waffen SS. His visa application initially was rejected because of this membership. Subsequently, however, the criteria changed so that membership in the Waffen SS was no longer a bar to qualifying as a displaced person. Thus, on March 28, 1952, the United States Displaced Persons' Commission certified Breyer eligible for a visa as a displaced person.

Breyer then applied to immigrate to the United States as an alien under the Act. He was granted an immigrant visa and entered the United States in May 1952. Breyerfiled a petition for naturalization in August 1957. On November 7, 1957, Breyer was naturalized as a United States citizen.

II. Procedural History

On April 21, 1992, the United States filed a five-count complaint against Johann Breyer in the United States District Court for the Eastern District of Pennsylvania under S1451(a) of the INA, as amended, 8 U.S.C.SS 1101 et seq. The complaint was filed to revoke Breyer's naturalized United States citizenship on the grounds that it was illegally procured (Counts I, II, III, IV) or was procured by concealment or willful misrepresentation (Count V). 4 The government sought to denaturalize Breyer because of his service as an armed SS guard at Buchenwald and Auschwitz.

_____

4. Section 1451(a) states, in pertinent part:

      S 1451. Revocation of naturalization

      (a) Concealment of material evidence; refusal to testify
      It shall be the duty of the United States attorneys for the respective
      districts, upon affidavit showing good cause therefor, to institute
      proceedings in any district court of the United States . . . for the
      purpose of revoking and setting aside the order admitting such
      person to citizenship and canceling the certificate of naturalization
      on the ground that such order and certificate of naturalization were
      illegally procured or were procured by concealment of a material fact
      or by willful misrepresentation. . . .

4

Breyer conceded that he was ineligible for displaced person's status as a result of his war time activities. Nevertheless, he contended that he could not be denaturalized because, when he entered this country in 1952, he did so lawfully, as a United States citizen. Breyer asserted that he derived citizenship at birth through his mother who, he claimed, was born in Philadelphia, Pennsylvania.

On October 30, 1992, Breyer filed an Application for Certificate of Citizenship with the Immigration and Naturalization Service (INS). In his application, Breyer claimed citizenship through his mother, pursuant to S 1452(a) of the INA. Soon thereafter, in the District Court action, the government filed a motion for summary judgment, seeking Breyer's denaturalization.

On July 7, 1993, the District Court granted partial summary judgment in the government's favor, denaturalizing Breyer. At the same time, the District Court considered Breyer's claim of citizenship through his mother under the equal protection clause and found thatS 1993 was unconstitutional as applied to Breyer because, at the time of Breyer's birth, it conferred citizenship to foreign born offspring of American fathers but not to those of American mothers. The District Court abstained from declaring Breyer a United States citizen, however, until after the trial on the issue of Breyer's citizenship through his mother. United States v. Breyer, 829 F. Supp. 773 (E.D. Pa. 1993) (Breyer I ).

The District Court held a four day bench trial to determine the birth place of Breyer's mother and found that she had, indeed, been born in the United States. The court held that the remedy for the unconstitutionality ofS 1993, as applied to Breyer, was to include mothers under the statute retroactively. Nevertheless, the District Court abstained from declaring Breyer a citizen because he had not exhausted his administrative remedies. His Application for Certificate of Citizenship was pending before the INS. The District Court then canceled Breyer's certificate of naturalization. The court concluded, however, that if Breyer were ultimately declared a citizen by birth, his certificate of naturalization would be an extraneous document and its

revocation would have no effect on his standing as a United States citizen. United States v. Breyer, 841 F. Supp. 679, 686 (E.D. Pa. 1993) (Breyer II ).

On December 29, 1993, Breyer filed a motion with the District Court for relief from the judgment and a motion to alter or amend the judgment, both of which were denied. Breyer appealed the denial. On appeal, we affirmed, inter alia, the District Court's cancellation of Breyer's certificate of naturalization, based on our finding that his war time activities disqualified him from being considered a "displaced person." United States v. Breyer, 41 F.3d 884, 890–91 (3d Cir. 1994) (Breyer III). We also concluded that the District Court had exceeded its jurisdiction by considering Breyer's derivative citizenship claim. We found that the court should have limited its review to the question of whether Breyer's naturalization certificate had been improperly obtained. Id. at 892.

Subsequently, the INS denied Breyer's Application for Certificate of Citizenship. He appealed the denial to the Administrative Appeals Unit ("AAU") of the INS, which upheld the INS's initial decision. Breyer appealed the AAU's decision, and on December 30, 1996, the AAU issued a final denial of Breyer's request for citizenship.

On January 22, 1997, the INS and the Office of Special Investigations ("OSI") of the United States Department of Justice instituted deportation proceedings against Breyer. Breyer was found deportable by an immigration judge on December 15, 1997.

On October 21, 1997, Breyer filed a Petition for Declaratory Judgment in the District Court for the Eastern District of Pennsylvania, requesting review of the AAU's denial of his application for citizenship. In the petition, Breyer claimed that he was entitled to citizenship, based on his mother's status as a citizen of the United States. The petition was amended on December 15, 1997, to include claims, inter alia, that the OSI had intentionally misled the District Court during prior proceedings regarding alleged material misrepresentations made by Breyer in his naturalization application and that the decision of Breyer's former counsel not to contest the OSI's summary judgment

6

motion was not authorized by Breyer. In a second motion to amend, filed on April 14, 1998, Breyer requested leave to add other defendants and claims pursuant to 42 U.S.C. SS 1983 and 1985. These claims alleged, inter alia, that there had been improper lobbying and delay and that S 101(c)(2) was a bill of attainder. The Commissioner of the INS moved to dismiss Breyer's petition for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). The Commissioner also opposed Breyer's motion to amend his petition a second time.

On August 27, 1998, the District Court granted the Commissioner's motion to dismiss Breyer's petition. Breyer v. Meissner, 23 F. Supp. 2d 521 (E.D. Pa. 1998) (Breyer IV). On August 28, the District Court denied Breyer's second motion to amend his petition. Breyer v. Meissner , 23 F. Supp. 2d 540 (E.D. Pa. 1998) (Breyer V). We will consider both orders on this appeal.

III. Jurisdiction and Standard of Review

We have appellate jurisdiction over this action pursuant to 28 U.S.C. S 1291. The District Court exercised jurisdiction by virtue of 8 U.S.C. S 1503(a) and 28 U.S.C. S 2201. Our review of the District Court's dismissal of Breyer's Petition for Declaratory Judgment and granting of the government's motion to dismiss Breyer's Petition is plenary. Lake v. Arnold, 112 F.3d 682, 684-85 (3d Cir. 1997). In reviewing a motion to dismiss, we allow the non-movant the benefit of all reasonable inferences drawn from the allegations contained in the complaint, and we accept these allegations as true. Id. at 684. However, we are not required to accept legal conclusions alleged or inferred in the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). We review the District Court's denial of Breyer's motion to amend his Petition a second time under an abuse of discretion standard. In Re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir. 1997).

7

IV. Discussion

A. Statutory Framework

1. Section 1993 of the Revised Statutes of 1874

In 1925, when Johann Breyer was born, S 1993 of the Revised Statutes of 1874 governed the grant of citizenship to children born to American citizens outside the United States. The section contained a gender-based distinction. It granted United States citizenship to the foreign-born children of American fathers but denied the same to the children of American mothers:

> All children heretofore born or hereafter born out of the limits and jurisdiction of the United States, whose fathers were or may be at the time of their birth citizens thereof, are declared to be citizens of the United States; but the rights of citizenship shall not descend to children whose fathers never resided in the United States.

This distinction was abandoned in 1934. In that year, Congress amended S 1993 to make it gender neutral. As amended, the statute extended citizenship to "[a]ny child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such child is a citizen of the United States." R.S. 1993, as amended by Act of May 24, 1934, ch. 344, S 1, 48 Stat. 797 (1934).5

Because Congress chose not to make the 1934 amendment retroactive, the previous version of S 1993 continued to govern the citizenship status of persons born before 1934. As a result, all children born abroad in 1934 or later to an American mother or father were entitled to American citizenship at birth; by contrast, children born abroad before 1934 were entitled to citizenship only if their fathers were American. Thus, Breyer did not benefit from the 1934 amendment to S 1993.

---

5. S 1993 was subsequently repealed and replaced. Derivative citizenship is now governed by provisions found at S 301 of INA, 8 U.S.C. S 1401.

2. INTCA

In 1994, Congress made the 1934 amendment to S 1993 retroactive for those born before 1934 by passing INTCA. Pub. L. No. 103-416, 108 Stat. 4305, 4306 (1994). Specifically, S 101(c)(1) of INTCA conferred citizenship at birth to all persons born before noon (Eastern Standard Time), May 24, 1934, to an American mother or father. Id. at 4306.

The amendment contained an exception, however. This exception, contained in S 101(c)(2), states that the retroactive application of the amendment "shall not confer citizenship on, or affect the validity of any denaturalization, deportation, or exclusion action against, any person who . . . was excluded from, or who would not have been eligible for admission to, the United States under the Displaced Persons Act of 1948 . . .." Id. at 4306.

B. Application of The Statutes to Breyer

Breyer challenges the constitutionality of S 1993 because it denied him citizenship at birth by way of his mother, while it would confer citizenship upon a similarly situated child if the child's father was American. He challenges the constitutionality of S 101(c)(2) of INTCA because, like S 1993, it denies him citizenship through his mother, although he could not have known when he committed his war time activities that they would be expatriating. He argues that S 101(c)(2) should not apply to him and that, like the children, born before 1934, of American fathers, he is entitled to citizenship pursuant to S 101(c)(1).

By contrast, the government argues that this case does not concern gender discrimination within the context of citizenship rights but rather Congress's powers to regulate immigration and naturalization. The government argues that S 1993 does not apply to Breyer because he was properly disqualified from citizenship under the Displaced Persons Act and thus, under S 101(c)(2), because of his war time activities. The government defends the constitutionality of S 101(c)(2) by arguing that the statute protects two legitimate and important governmental objectives: it eliminates the gender distinction formerly contained in S 1993 by ensuring the equal treatment of all

9

foreign-born children who have committed expatriating acts, and it protects national security by ensuring the integrity of American citizenship.

The District Court's dismissal of the declaratory judgment action was based only on S 101(c)(2). First, it determined that Breyer was ineligible for entry into this country as a displaced person and that his improper attainment of a certificate of naturalized citizenship made S 101(c)(2) of INTCA applicable to this case. Although the court noted that it was considering Breyer's mother's rights, Breyer IV, 23 F. Supp. 2d at 531 n.7, it did not review the statute as to how it affected the mother. Second, the District Court concluded that Congress's regulation of immigration and naturalization, including its passage of S 101(c)(2), was entitled to great deference. Id. at 532. Thus, in the immigration context, the court analyzed S 101(c)(2) under the functional equivalent of the rational relation standard of review applied in equal protection cases that do not involve suspect classes. This test requires a "facially legitimate and bona fide" rationale for S 101(c)(2). Id. at 533 (citing Fiallo v. Bell, 430 U.S. 787, 794 (1977)).6 Under this standard, the District Court found that the statute advanced the remedial goal of protecting national security and of ensuring equal treatment to foreign-born children of American women, including those children who have committed expatriating acts or who are ineligible for entry into the United States. Id. at 534-37.

The District Court then dismissed Breyer's claim that retroactive application of S 101(c)(2) violated due process on the same basis as its equal protection analysis. Moreover, the court concluded that Breyer had no protected interest in citizenship that implicated the right to due process. Id. at 538. The District Court concluded in a footnote that Breyer's claim to citizenship from birth was mooted by

_____

6. The "facially legitimate and bona fide reason" test established in Fiallo,
430 U.S. at 794, an immigration case, has been found analytically equivalent to the rational basis test normally applied in equal protection cases in which no suspect class is involved. See Ablang v. Reno, 52 F.3d 801, 804 (9th Cir. 1995); Azizi v. Thornburgh , 908 F.2d 1130, 1133 n.2 (2d Cir. 1990).

S 101(c)(2). Id. at 538 n.12. The District Court also determined that S 101(c)(2) was not a bill of attainder. Id. at 540.

## 1. Equal Protection Analysis

We find, however, that the District Court's analysis inadequately addressed the issues presented in this case. This case involves a conflict with regard to the transmission of citizenship both to the parent and to the child. For that reason, to the extent that a parent's right to equal protection was violated by S 1993, we cannot ignore that statutory provision and thereby limit our analysis to S 101(c)(2). The District Court erred when it found S 1993 inapplicable to the facts of this case and concluded that Breyer's claim posed a challenge only to S 101(c)(2). Because Breyer is making his claim by an assertion of his mother's rights under S 1993, both S 1993 of INA and S 101(c)(2) of INTCA are applicable. We must begin our analysis at the time when the mother's right that Breyer is asserting was implicated -- i.e., in 1925 when Johann Breyer was born.

### a. Section 1993

Our first consideration under S 1993 is that of standing: Is Johann Breyer entitled to assert his mother's equal protection rights pursuant to the doctrine of third party standing? This doctrine was most recently explicated in Campbell v. Louisiana, 523 U.S. 392 (1998). In Campbell, the Supreme Court held that a white criminal defendant had standing to raise equal protection and due process objections to discrimination against blacks in the selection of grand jurors where this bias was alleged to have infected the state's process of prosecuting and convicting him. Id. at 395-403. In reaching this decision, the Court reiterated that one who wishes to assert a third party's rights must demonstrate "injury in fact," a close relationship to the third party, and a hindrance to the third party asserting its own rights. Id. at 397 (citing Powers v. Ohio, 499 U.S. 400, 411 (1991)).

Breyer meets these prerequisites for asserting his mother's equal protection rights: his own alleged

11

deprivation of citizenship as a result of discrimination against his mother constitutes injury-in-fact, the closeness of his relationship to his mother is obvious, and his mother's death most definitely constitutes a hindrance to her assertion of her own rights. Accord Wauchope v. United States Dep't of State, 985 F.2d 1407, 1411 (9th Cir. 1993) (rejecting government's claim that foreign-born offspring of deceased American mothers did not have standing to challenge the constitutionality of R.S. S 1993); Aguayo v. Christopher, 865 F. Supp. 479, 484 (N.D. Ill. 1994) (same); Elias v. United States Dep't of State, 721 F. Supp. 243, 246-47 (N.D. Cal. 1989) (same).

Our next consideration is the standard of scrutiny we will apply to Breyer's assertion of his mother's rights. The application of S 1993 to Breyer's mother concerns her right to equal protection under the laws. Because S 1993 created a gender classification with respect to Breyer's mother's ability to pass her citizenship to her foreign-born child at his birth, the section is subject to heightened scrutiny. Thus, this action is distinguishable from cases in which courts have considered the equal protection rights of naturalized persons themselves and found heightened scrutiny inapplicable. See Linnas v. INS, 790 F.2d 1024, 1032 (2d Cir.), cert. denied, 479 U.S. 995 (1986).

Likewise, because we consider the rights of Breyer's mother, this case is distinguishable from Miller v. Albright, 523 U.S. 420 (1998), the recent case in which the Supreme Court considered S 1409(a) of the INA. Section 1409(a) requires that by the age of 18 foreign-born illegitimate children of American fathers present formal proof of paternity in order to obtain citizenship, while illegitimate children born abroad to American mothers obtain that citizenship at birth. See 523 U.S. at 426-28. The Miller Court did not invalidate S 1409(a), and the lead opinion in the case, written by Justice Stevens, considered the statute under a rational relation standard of scrutiny. Id. at 441. The judgment in Miller was reached by a highly divided Court, however, with five justices issuing five separate opinions, and three justices dissenting. Thus, the precedential value of Miller is unclear, particularly in regard to the applicable standard of review for INA statutes that

12

contain gender classifications. See Rappa v. New Castle
County, 18 F.3d 1043, 1057-61 (3d Cir. 1994) (observing
that when Supreme Court decision is plurality, withfive
separate opinions issued by those agreeing as to judgment,
it is difficult to ascertain what is "law of land" and guiding
principles) (citing Marks v. United States, 430 U.S. 188, 193
(1977)).

Even though we do not find clear guidance from the
Court in Miller, we do find three lines of thought that are
relevant to our decision to apply heightened scrutiny to
Breyer's claims through his mother under S 1993. First,
Justice Stevens in the opinion of the Court, which was
joined by Chief Justice Rehnquist, rejected the petitioner's
grounds for finding S 1409(a) unconstitutional. He rejected
the gender-based rationale because "the conclusion that
petitioner is not a citizen rests on several coinciding factors,
not just the gender of her citizen parent." 523 U.S. at 442.
As he stated further, "[I]t is not merely the sex of the citizen
parent that determines whether the child is a citizen under
the terms of the statute; rather, it is an event creating a
legal relationship between parent and child--the birth itself
for citizen mothers, but post-birth conduct for citizen
fathers and their offspring." Id. at 443.

We can distinguish S 1993 from S 1409(a), however,
because the offspring seeking citizenship underS 1993 are
not illegitimate. For that reason, there is no further
parental acknowledgment required of the male or of the
female parent beyond the fact of the child's birth.

Second, we note that Justice O'Connor in her concurring
opinion, joined by Justice Kennedy, found that the
petitioner did not have third party standing. The petitioner
had not demonstrated that her father, who was still living,
could not assert his rights. Justice O'Connor commented,
"The statute . . . accords differential treatment to fathers
and mothers, not to sons and daughters. Thus, although
petitioner is clearly injured . . ., the discriminatory impact
of the provision falls on petitioner's father . . . who is no
longer a party to this suit. Consequently, I do not believe
that we should consider petitioner's gender discrimination
claim." Id. at 445-46. In the absence of the father, the
daughter's challenge to the constitutionality ofS 1409, if

13

indeed assertable, triggered only rational basis scrutiny: "[Section] 1409 does not draw a distinction based on the gender of the child, so petitioner cannot claim that she has been injured by gender discrimination." Id . at 451.

Third, we note in Justice Breyer's dissenting opinion, joined by Justices Souter and Ginsburg, that Justice Breyer found that the petitioner did have standing to assert her father's rights. Id. at 473. He concluded that Miller involved citizenship rights, id. at 476-77, the "most precious right," id. at 477 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 159 (1963)), rather than alienage. Based on his determination that the case involved a gender classification within the context of citizenship, Justice Breyer applied a heightened level of scrutiny to the gender-based classification at issue in S 1409(a). 523 U.S. at 477-78. Applying this standard, Justice Breyer foundS 1409(a) unconstitutional: "If we apply undiluted equal protection standards, we must hold the . . . statut[e] at issue unconstitutional." Id. at 481.

Because the case before us also involves a third party claim derived from the rights of the American citizen mother and because the mother can no longer assert her rights herself, we conclude that a heightened level of scrutiny should apply here.

Although this case, like Miller, "is about American citizenship and its transmission from an American parent to [her] child," id. at 476, we address these issues within the disturbing context of a child who grew up to become a Nazi and who now desires the equal protection of our laws. While this context may appear in tension with the ideals of American citizenship, in actuality it demonstrates how precious the equal application of the laws is to a just society. Indeed, Nazi persecution of those deemed inferior, including those believed to be morally undesirable, was accomplished in part through the manipulation and biased application of the law.7 Thus, history teaches that we must

_____

7. See WILLIAM L. SHIRER, THE RISE AND THE FALL OF THE THIRD R
              EICH 196 (4th
ed. 1988) (describing how the passage in 1933 of the"Law for Removing
the Distress of People and Reich" cloaked the rise of Nazi party "in

apply the laws even-handedly, at all times, to all people, including those whose actions we find to have been repugnant. With these considerations in mind, we will evaluate S 1993, as applied to Breyer's mother, and through her to Johann Breyer, an admitted SS guard, under the same heightened standard of scrutiny to which any other gender-based classification is subject. See e.g. United States v. Virginia, 518 U.S. 515, 531 (1996); Mississippi Univ. for Women v. Hogan, 458 U.S. 718, 724 (1982); Frontiero v. Richardson, 411 U.S. 677, 684 (1973).

This heightened level of scrutiny requires "[p]arties who seek to defend gender-based government action [to] demonstrate an `exceedingly persuasive justification' for that action." Virginia, 518 U.S. at 531 (citing J.E.B. v. Alabama, 511 U.S. 127, 136-37 & n. 6 (1994) and Mississippi Univ. for Women, 458 U.S. at 724). An exceedingly persuasive justification must be proffered even if the statute at issue is designed to remedy past gender-based discrimination. Virginia, 518 U.S. at 533; cf. Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 220-22 (1995) (requiring strict scrutiny of race-based classifications made by federal government, even if they are designed to remedy past discrimination). The burden of proving that the gender-based classification in question "serves important objectives" and that the discriminatory means employed to achieve these objectives are "substantially related" to the achievement of those objectives "rests entirely on the State." Virginia, 518 U.S. at 533.

We do not find that the government has offered an "exceedingly persuasive justification" in support of the gender classification that prevented Breyer's mother from conveying American citizenship at the birth of her son. In fact, the government has not at all attempted to justify the

_____

legality"); id. at 200-01 (describing the promulgation of the "Law for the Reconstruction of the Third Reich" in 1934 and explaining how it "lawfully" allowed the development of a "one-party totalitarian [Nazi] State [to be] achieved with scarcely a ripple of opposition or defiance"); id. at 263 (describing how the "Law Regulating National Labor" of 1934 made German workers "industrial serfs," and captains of industry "absolute masters").

15

classification contained in S 1993. Instead, the government maintains that this case is not at all about gender discrimination in the transmission of citizenship rights but about the government's right to deny entry and citizenship to Nazis and like individuals. Thus, the government argues that Breyer's claim should only be considered under INTCA, and in particular under S 101(c)(2). We find, however, that this case indisputably concerns gender discrimination within the context of the transmission of citizenship rights. Because Breyer is asserting his mother's rights, which arose in 1925, we must deal with S 1993 before we turn to S 101(c)(2), and in doing so we must analyze the impact of the discriminatory language of S 1993.

The government has chosen not to present a justification for this preliminary step of analyzing the purpose behind S 1993. They must for this reason concede thisfirst step. There is no support in the case law for surmising a defense for the government in gender discrimination cases, where it has not offered one. We will not do so here.

In finding that S 1993 unconstitutionally perpetuated gender discrimination, we are joined by the Ninth Circuit and two district courts, all of which reviewed the statute under the much more deferential rational relation standard of review. See Wauchope, 985 F.2d at 1416 ("The United States has not set forth a facially legitimate and bona fide reason to justify [S 1993's] unequal treatment of citizen men and women."); Aguayo, 865 F. Supp. at 490 (finding that S 1993 is unconstitutional under rational relation standard because it unlawfully discriminates against those"whose only misfortune . . . was to be born of citizen mothers instead of citizen fathers); Elias, 721 F. Supp. at 249 ("[W]e are obliged to find [S 1993's] differential treatment of men and women unconstitutional if the review power explicitly articulated by the Fiallo Court is to have any meaning.").

We conclude, therefore, that S 1993 does not survive equal protection analysis. It unconstitutionally discriminated against Breyer's mother on the basis of gender, with the effect of depriving her son, Johann Breyer, of citizenship at birth.

16

b. Section 101(c)(2)

Having determined that Breyer's mother was denied equal protection of the laws by S 1993 and that she should have been entitled to pass on her U.S. citizenship to her son at the time of his birth, we now turn to the effect of the 1994 amendment to the INA, which added S 101(c)(2). Breyer claims that S 101(c)(2) perpetuates the discriminatory impact of S 1993 in that it deprives his mother of the right to pass on her citizenship to him due to wrongdoing on his part in a situation where he could not know of the expatriating effect of his wrongdoing.

The government defends the constitutionality of S 101(c)(2) by citing two rationales for the statute's enactment. It eliminates the gender distinction formerly contained in S 1993 by ensuring the equal treatment of all foreign-born children who have committed expatriating acts, and it protects the national security by ensuring the integrity of American citizenship. The remedying of gender discrimination is the primary justification offered for S 101(c)(2).

The District Court found these reasons bona fide and legitimate under the Fiallo standard. Breyer IV, 23 F. Supp. 2d at 533-37. The court's decision was premised on its assumption that Breyer was asserting an equal protection claim not as a putative citizen but as an alien who clearly is deportable under S 101(c)(2). Id. at 535. The court found that "[t]he people affected by INTCA are not citizens who are expatriated by 101(c)(2); they are instead aliens who are denied naturalization by S 101(c)(2), and the denial of naturalization burdens no fundamental right of citizenship." Id. Reviewing S 101(c)(2) under the deferential Fiallo standard, the court accepted the government's justifications for the statute's constitutionality. The District Court found S 101(c)(2) a legitimate means of ensuring the equal treatment of all foreign-born children of American citizens, who have committed expatriating acts, and of protecting the national security. Breyer IV, 23 F. Supp. 2d at 533--37.

We disagree with the analysis of the District Court. Its decision appears to be predicated upon the incorrect

17

assumption that Breyer's challenge to S 101(c)(2) was asserted only on his own claim to citizenship, rather than on his assertion of his mother's claim to equal protection. However, as we stated supra, Breyer asserts his mother's equal protection rights as to S 1993. As we explain below, we conclude that S 101(c)(2) incorporates the gender discrimination of S 1993, as applied to Breyer's mother. For that reason, the rights of Breyer's mother, an American citizen, underpin Breyer's challenge to S 101(c)(2).

The fundamental problem with S 101(c)(2) as applied to Breyer and his mother is that it preserves an anomaly: Whereas a child born to an American father is and always has been entitled to United States citizenship at birth, a particular subset of children born to an American mother continue to be excluded from citizenship. Thus, while S 101(c)(1) cured the discriminatory effects of S 1993, as written in 1925 and amended in 1934, S 101(c)(2) took away that cure for a subset of American mothers whose foreign-born off-spring have committed certain acts. However, it is the conduct of the offspring, not the conduct of the American citizen mothers, that determines the differentiation. The 1994 amendment does not then "completely and irrevocably eradicat[e] the effects" of the discrimination against mothers contained in S 1993. See County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979) (holding that claim is moot only if violation has ceased and interim relief or events have "completely and irrevocably eradicated the effects" of the violation).

Moreover, it is clear from the legislative history that Congress was focused on the offspring, and not on the remedy for S 1993's discrimination to the mothers, when it enacted S 101(c)(2). Representative [now Senator] Schumer explained that the bill that would become S 101(c)(2) remedied the gender discrimination inherent in S 1993 as it applied to some American citizen mothers, but intentionally did not extend that cure to mothers of certain offspring who had committed "expatriating" acts.

> Currently, only a child of an American father born overseas can be naturalized. This provision would extend naturalization to children born of American mothers--ironing out a wrinkle in our immigration law.

18

> However, there are several Nazi expatriation cases
> pending in the United States that would be jeopardized
> if Nazi children of American mothers were to be
> naturalized. Nazis born to American fathers do not
> have this problem because a recent court case ruled
> that if an individual was aware of their U.S. citizenship
> at the time the crimes were committed they can be
> found guilty of an expatriating crime. Obviously Nazis
> naturalized retroactively could not have known of their
> U.S. citizenship during the time their crimes were
> committed. Proper persecution of these individuals
> depends on the ability to denaturalize and deport them
> to stand trial overseas for war crimes. Although this is
> a strange twist in the law it must be reconciled. H.R.
> 783 would do just that.

Vol. 140, No. 132 Cong. Rec. H9280 (daily ed. Sept. 20, 1994) (statement of Rep. Schumer); see also id . at H9277 (recognizing that relevant section of INTCA corrected sex discrimination in S 1993, as amended, "while expressly prohibit[ing] the conferral of citizenship to anyone who assisted in any form of Nazi persecution") (statement of Rep. Mazzoli).

These statements demonstrate that Congress contemplated that the exception contained in S 101(c)(2) would exclude persons like Breyer.8 Congress's decision to employ S 101(c)(2) to deny citizenship to Breyer and to similarly situated children of American citizen mothers was premised on case law that holds that the government must prove that a citizen has intended to relinquish citizenship in order to demonstrate that that citizen has expatriated himself. See Vance v. Terrazas, 444 U.S. 252, 270 (1980). Since S 1993 granted citizenship to the foreign-born children of male American citizens during all relevant periods, these children may have been aware of their American citizenship during the World War II period. See United States v. Shiffer, 831 F. Supp. 1166, 1190-91 (E.D.

_____

8. The Department of Justice, which prosecuted Breyer's denaturalization claim in the trial courts, lobbied for the exception contained in S 101(c)(2). See Vol. 139, No. 164 Cong. Rec. S16863 (daily ed. Nov. 23, 1993) (statement of Sen. Kennedy).

Pa. 1993), aff'd, 31 F.3d 1175 (3d Cir. 1994). The voluntary participation in Nazi persecution by those who were aware of the expatriating nature of their actions has been found inconsistent with an intent to retain United States citizenship. See Shiffer, 831 F. Supp. at 1191 (citing Richards v. Secretary of State, 752 F.2d 1413, 1420 (9th Cir. 1985)). Thus, the government can expatriate the children of American citizen fathers who knowingly committed expatriating acts.

By contrast, since S 1993 discriminated against the foreign-born children of American females during all relevant periods, these children presumptively would not have known that their participation in Nazi persecution constituted an act of expatriation. Thus, they may not have realized that these actions would forfeit their American citizenship, of which they were also unaware at the time. Section 101(c)(2) attempts to skirt the requirement that a citizen intend, by his actions, to expatriate himself. It does so by referring to certain conduct by offspring that can in turn lead to denaturalization, deportation, or exclusionary proceedings against the offspring, rather than to the offspring's act of expatriation itself. This shift in the prohibitory language eliminates the intent requirement, which the Supreme Court established in Terrazas  for citizens, and substitutes for it the test applied to aliens, which does not require a showing of intent.

This differentiation, however, leaves the underlying discrimination intact. Rather than eradicating all discrimination occasioned by S 1993, S 101(c)(2) perpetuates it by imposing a different test on the foreign-born offspring of American mothers than it does on the foreign-born offspring of American fathers. The foreign-born children of American fathers will acquire citizenship at birth and lose it only by intentionally committed expatriating acts. The foreign-born children of American citizen mothers will be prevented from obtaining American citizenship if they, with or without intent, have committed similar expatriating acts. The subjection of American women to this additional burden for the transmission of citizenship to their foreign-born offspring is in fundamental tension with the principle of equal protection. Wefind no

20

legitimate reason for such disparate treatment of American citizen mothers that is sufficient to override their guarantee to equal protection of the laws. We reach this conclusion even though the foreign-born children have committed acts that we find morally repugnant. Our focus in this section of our analysis is on the mother, not on the offspring. Moreover, the fact that S 101(c)(1) of INTCA remedies discrimination against some American citizen mothers does not cure the defects inherent in S 101(c)(2).

Nor is the dissimilar treatment of American citizen mothers, perpetuated by S 101(c)(2), justified as a means of protecting national security. The government provides no evidence in support of this proposition. The government position is directed to the offspring, not to the American citizen mothers. Indeed, the cases that the District Court cites to support its conclusion that the government's national security justification for S 101(c)(2) is rational refer only to alienage. For that reason, these cases do not control the interests of American citizen mothers or their foreign-born children, but only the interests of resident aliens with no birth claim to citizenship. See, e.g., Harisiades v. Shaughnessey, 342 U.S. 580, 588-89 (1950) (upholding expulsion of resident aliens for membership in the Communist party); Schellong v. INS, 805 F.2d 655 (7th Cir. 1986); Linnas, 790 F.2d at 1030. Consequently, because these cases offer us no guidance on how S 101(c)(2) impacts the equal protection right of Breyer's American citizen mother relative to S 1993, they are inapposite to this action.

For these reasons, we conclude that the disparate treatment of mothers that S 101(c)(2) perpetuates is arbitrary and irrational, see Vance v. Bradley , 440 U.S. 93, 97 (1993). We hold that S 101(c)(2), as applied to Breyer's mother and through her to Johann Breyer, violates equal protection by perpetuating the gender discrimination contained in S 1993, which prevented his mother from transmitting citizenship to him at birth. Johann Breyer should be entitled to American citizenship relating back to the time of his birth.

2. Intent Requirement for Expatriating Acts

This conclusion does not, however, terminate our consideration of this difficult case. We have determined that

21

Johann Breyer should have been entitled to American citizenship from the date of his birth, but is he still so entitled? Even though we conclude that S 101(c)(2) is constitutionally invalid, must we ignore Johann Breyer's activities during World War II and the impact that the decisions he made during that period may have had on his present claim to citizenship?

Let us begin our further consideration by reviewing the reason for which Congress amended the statute in 1994 in the way in which it did. Congress based the exclusionary provisions of S 101(c)(2) on denaturalization, deportation or exclusion grounds, rather than on the grounds for expatriation. The reason for this is that a denaturalization, deportation, or exclusion action against an alien can be taken without any proof that the alien intended to commit the acts that qualify him for the sanction; there is no intent requirement. On the other hand, the Supreme Court has held that a citizen cannot be expatriated without an intent to surrender United States citizenship. See Terrazas, 444 U.S. at 270. The decision in Terrazas grew from the holding in Afroyim v. Rusk, 387 U.S. 253 (1967), in which the Supreme Court ruled that Congress could not take away citizenship simply on the basis of certain actions a citizen may have taken, without a citizen voluntarily renouncing it or giving it up. Arguably, Breyer could not have intended to surrender his American citizenship if he did not realize that he was entitled to it. Nevertheless, we see an important distinction between the facts of cases like Terrazas and Afroyim and the situation before us.

Beys Afroyim was born in Poland and naturalized as an American citizen when he was a young man. After 34 years he went to Israel where he voted in an election for the Israeli Knesset. When he went to the American Embassy to renew his passport, the Department of State refused to do so on the ground that he had lost his American citizenship by virtue of S 401(e) of the Nationality Act of 1940, which provided that a citizen would "lose" his citizenship if he voted in a political election in a foreign state. Afroyim challenged this decision, and ultimately the Supreme Court held that Congress could not deprive him of his citizenship unless he voluntarily relinquished it.

Laurence Terrazas held American and Mexican citizenship from the time of his birth in the United States as the son of a Mexican citizen. When he was a student in Mexico at the age of 22, he executed an application for a certificate of Mexican nationality "expressly renounc[ing] United States citizenship, as well as any submission, obedience, and loyalty to any foreign government, especially to that of the United States of America . . .." 444 U.S. at 255. He obtained a certificate of Mexican citizenship that provided that he had "expressly renounced all rights inherent to any other nationality, as well as all submission, obedience, and loyalty to any foreign government, especially to those which have recognized him as that national." Id. Terrazas later brought suit against the Secretary of State for a declaration of his U.S. nationality. The government argued that Terrazas had knowingly sworn allegiance to Mexico and renounced his allegiance to the United States. The Supreme Court held that when a statutory expatriating action is proved by a preponderance of the evidence, it is constitutional to presume the action to have been voluntary "until and unless proved otherwise by the actor." Id. at 270. If the actor succeeds in proving the act was not voluntary, he will not be expatriated. If he fails, the court must determine whether the expatriating act was performed with an intent to relinquish citizenship. Id. Terrazas's case was remanded for the District Court to make furtherfindings on voluntariness.

The acts committed by Johann Breyer are very different from those of Afroyim and Terrazas. During World War II, when Germany was at war with the United States, Breyer joined first the Waffen SS and then the Death's Head Battalion. The Waffen SS was a voluntary organization.9 The Death's Head units were composed of volunteers from other SS units.10 Apparently, Breyer may have made a knowing and voluntary decision to join each of these groups. Some historians assert that such a commitment

---

9. Apparently until approximately mid–1942, no one was compelled to join any part of the SS organization. Enlistment was genuinely voluntary. See HELMUT KRAUSNICK ET AL., ANATOMY OF THE SS STATE 387 (1965).

10. Id. at 570.

was knowing and voluntary. One commentator has described the situation as follows:

> So anyone who joined the SS later than 1934 must have known what he was doing. Naturally the extent to which a man realized the significance of his action depended in some degree upon his educational level and political background; a yokel joining a Totenkopf Sturmbann in 1937 is not to be equated with a barrister entering the SD at the same period. Nobody joining the SS could of course know that he would later be ordered to take part in organized mass murder; nevertheless anyone must have been aware that he was joining an organization where he would have to carry out illegal orders. By the mere fact of joining he was accepting certain principles and practices which could not but lead on occasions to culpable action. No one of course who lives under a totalitarian system can be sure that he will not one day be forced into a tragic situation for which he may be held guilty. Entry into the SS, however, implied that a man accepted this risk with his eyes open. The nearest to an exception was the man who joined the SS-Verfugungstruppe; it was, of course, part of the praetorian guard but nevertheless its training was clearly exclusively military and it had nothing to do with the political duties of the Allgemeine SS, with political police matters or with concentration camps. Everybody, however, who joined the SS was forsaking the sphere in which obligations were simply those of the normal loyal citizen and entering that in which the ideological order was paramount. By the mere fact of joining the SS every man was giving his ideological assent and declaring himself ready to do more than his duty.[11]

The above description of the knowing commitment made by a member of the Death's Head Battalion, during a period when Germany was at war with the United States, demonstrates a loyalty to the policies of Nazi Germany that is wholly inconsistent with American citizenship. Although when he took his oath of allegiance first to the Waffen SS

_____

11. Id. at 390.

24

and then to the Death's Head Battalion, Johann Breyer was not aware of his right to American citizenship, one could conclude that he voluntarily made a commitment that, had he known of this right, clearly would have repudiated it. Afroyim and Terrazas do not deal with such a situation where a knowing commitment to a foreign nation at war with the United States is accompanied by voluntary acts that plainly disclaim any allegiance to the United States and the political principles for which it stands. We conclude that Johann Breyer may have made such a disclaimer of allegiance to the United States by a voluntary enlistment in the Waffen SS and then again in the Death's Head Battalion.

Under Terrazas, Breyer has the burden of proving that his expatriating acts were not voluntary.12 If these acts were voluntary, however, the court must determine whether they were performed with an intent to relinquish citizenship. We conclude that a voluntary oath of allegiance to a nation at war with the United States and to an organization of that warring nation that is committed to policies incompatible with the principles of American democracy and the rights of citizens protected by the American constitution-- an organization such as the Death's Head Battalion-- is an unequivocal renunciation of American citizenship whether or not the putative citizen is then aware that he has a right to American citizenship.

We will, therefore, remand this case to the District Court to make further findings concerning the circumstances under which Breyer joined the Waffen SS and the Death's Head Battalion to determine if his actions constitute a voluntary and unequivocal renunciation of any possible allegiance to the United States of America, a renunciation made in a time of war against the United States that demonstrated an allegiance to Nazi Germany and a repudiation of any loyalty -- citizen or not -- to the United States. Cf. Perez v. Brownell, 356 U.S. 44, 68 (1958) (Warren, C.J., dissenting and stating that some actions "may be so inconsistent with the retention of citizenship as

_____

12. Entering the armed forces of a foreign state or serving in its government is an expatriating act. See 8 U.S.C. S 1481(a)(4) and (5).

25

to result in loss of that status."). On remand, the District Court must determine whether Breyer's acts constitute such a renunciation.

Because of our conclusion on the unconstitutionality of S 101(c)(2), we do not need to consider Breyer's due process and bill or attainder arguments. Concerning Breyer's contention that he should have had the right to amend his complaint for a second time, Fed. R. Civ. P. 15(a) allows a party to amend his complaint once as a matter of right. Subsequent amendments are at the discretion of the court; courts may deny leave to amend on grounds such as undue delay, dilatory motive, bad faith, prejudice, and futility. In Re Burlington Coat Factory Sec. Litig., 114 F.3d at 1434. Courts are advised to grant leave to amend if "justice so requires." Id.

Breyer appeals the District Court's failure to grant him leave to amend his Petition a second time, after he amended it once as a matter of right. The District Court's refusal to grant Breyer leave to amend a second time was based on its determinations that the amendments were predicated upon a dilatory motive, and in any event, would be futile. The District Court's reasoning regarding Breyer's request to amend is set forth in a lengthy and thoughtful memorandum.

After reviewing the record in this case and the court's Memorandum and Order denying the motion to amend, we find no cause to disturb the District Court's conclusions. Therefore, we find that the District Court did not abuse its discretion in failing to allow Breyer to amend his Petition a second time.

V. Conclusion

For the foregoing reasons, we conclude that Johann Breyer was improperly denied citizenship at birth and reverse the District Court's Order of August 27, 1998. We affirm the Order of August 28, 1998, denying Breyer leave to amend his complaint. We remand this case to the District Court for further proceedings consistent with this opinion.

26

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit