PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1461
_____

JOSE FRANCISCO TINEO
AKA Luis Alberto Padilla, AKA Jose Sanchez,
                                        Petitioner

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA,
                                        Respondent
_____

On Petition for Review of a Decision of the
United States Department of Justice
Board of Immigration Appeals
(A040-015-082)
Immigration Judge:  Walter A. Durling
_____

Argued January 19, 2018
_____

Before: SMITH, *Chief Judge*, GREENAWAY, JR., and
KRAUSE, *Circuit Judges*.

(Opinion Filed: September 4, 2019)

_____

OPINION

_____

Charles N. Curcio [ARGUED]
Curcio Law Firm
3547 Alpine Avenue NW
Suite 104
Grand Rapids, MI 49544
    _Attorney for Petitioner_


Stefanie N. Hennes [ARGUED]
United States Department of Justice
Office of Immigration Litigation
P.O. Box 878
Ben Franklin Station
Washington, DC 20044
    _Attorney for Respondent_


GREENAWAY, JR., _Circuit Judge_.

In plain terms, we are called to decide whether precluding a father from ever having his born-out-of-wedlock child derive citizenship through him can be squared with the equal-protection mandate of the Due Process Clause of the Fifth Amendment.

In not so plain terms, under the now repealed 8 U.S.C. § 1432(a)(2), a "child" born outside of the United States to noncitizen parents became a citizen upon the naturalization of

2

her surviving parent if one of her parents was deceased.[1] Section 1101(c)(1) in turn defined "child" as including a child born out of wedlock only in so far as the child was legitimated under the "law of the child's residence or domicile" or "the law of the father's residence or domicile . . . except as otherwise provided in . . ." § 1432. 8 U.S.C. § 1101(c)(1). Section 1432(a)(3) rounded out the triumvirate and exempted mothers of born-out-of-wedlock children from the legitimation requirement by expressly adding that "the naturalization of the mother" was sufficient "if the child was born out of wedlock and the paternity of the child has not been established by legitimation . . . ." *See* § 1432(a)(3).

As a result, §§ 1101(c)(1), 1432(a)(2) and (a)(3) treated women and men differently: a naturalized mother could transmit her citizenship to her out-of-wedlock child, regardless of whether the father was alive; whereas a naturalized father in the same position had the additional requirement of having to legitimate the child in order to transmit his citizenship.

Our present concern is not with this differential treatment, however. That affirmative steps to verify paternity, including legitimation, may be taken if a citizen parent is an unwed father has withstood constitutional scrutiny in the past, on the basis that the relation between a mother and a child "is verifiable from the birth itself," and likewise "the opportunity

---

[1] That is, provided that (1) the naturalization takes place while the child is under eighteen years old, and (2) (a) the child is residing in the United States as a lawful permanent resident when the parent naturalizes or (b) thereafter begins to reside permanently while under the age of eighteen. 8 U.S.C. § 1432(a)(4) & (5).

for the development of a relationship between citizen parent and child . . . ." *Nguyen v. INS.*, 533 U.S. 53, 62, 65 (2001); *see also Trimble v. Gordon*, 430 U.S. 762, 771 (1977) ("The more serious problems of proving paternity might justify a *more demanding* standard for illegitimate children claiming under their fathers' estates than that required for [those] claiming under their mothers' estates . . . ." (emphasis added)). Rather, like in *Trimble*, the present concern is with a father being *forever* precluded from having his out-of-wedlock child derive through him. This problem only arises where the child's mother is deceased, and the only avenue for legitimation under the relevant law is through the marriage of the parents. In that instance, naturalized fathers cannot transmit their citizenship to their out-of-wedlock children as a result of the interplay between §§ 1101(c) and 1432(a)(2), whereas naturalized mothers can via at least § 1432 (a)(3).

Such is the case with the petition before us. Petitioner Jose Francisco Tineo was born in the Dominican Republic to unwed noncitizen parents who never married. His father moved to the United States and naturalized. His noncitizen mother soon after passed away. At the time, under the law of either his or his father's residence or domicile—the Dominican Republic and New York—legitimation could only occur if his birth parents married. So Tineo's father was forever precluded from having his son derive citizenship through him, despite being a citizen and having cared for his son until the child was 21 years old. On the cusp of being removed from the United States as a noncitizen, Tineo brings this Fifth Amendment challenge to the relevant provisions on behalf of his now deceased naturalized father. We hold that, in this circumstance, the interplay of §§ 1101(c)(1), 1432(a)(2) and (a)(3) cannot be squared with the equal-protection mandate of

4

the Due Process Clause of the Fifth Amendment. We will therefore grant Tineo's petition.

## I. Background

### A. Arrival in the United States

Tineo was born in the Dominican Republic on January 16, 1969. His parents, both citizens of the Dominican Republic, never married. His father, Felipe Tineo, moved to the United States and became a naturalized U.S. citizen in 1981. Two years later, his father married a legal permanent resident.

Tineo came to live with his father once his birth mother died in 1984. He was admitted to the United States as a lawful permanent resident on June 15, 1985, pursuant to an alien relative petition filed by his stepmother. He was 15 years old at the time and lived with his father until he turned 21 in 1990.

### B. Removal Proceedings

Felipe Tineo died an American in 2006. The question of his son's citizenship has come up on two occasions: once before his death and once after. Both were in the context of removal proceedings. This is in part because only noncitizens may be removed. *See* 8 U.S.C. § 1229a(a)(1); *see also Ng Fung Ho v. White*, 259 U.S. 276, 284 (1922) ("Jurisdiction in the executive to order [removal] exists only if the person . . . is a [noncitizen]. An assertion of U.S. citizenship is thus a denial of an essential jurisdictional fact in a [removal] proceeding." (internal quotation marks omitted)) (quoted in *Minasyan v. Gonzales*, 401 F.3d 1069, 1075 (9th Cir. 2005)); *Gonzalez-Alarcon v. Macias*, 884 F.3d 1266, 1272 (10th Cir. 2018)

(noting that citizenship constitutes the denial of an essential jurisdictional fact in a removal proceeding because only noncitizens are removable). As a consequence, immigration judges terminate removal proceedings where the government cannot demonstrate that a petitioner is a removable noncitizen. *See* 8 U.S.C. § 1229a(c)(3)(A); 8 C.F.R. § 240.8(a); *see also Dessouki v. Att'y Gen. of U.S.*, 915 F.3d 964, 966 (3d Cir. 2019) ("[T]he government failed to prove that Dessouki was [a noncitizen]. So an immigration judge terminated his removal proceedings.").

1.

The first proceeding occurred when Tineo was convicted for the sale of a controlled substance in New York state court on October 19, 1993. He was issued a Notice to Appear ("NTA") dated April 20, 2000 and placed in removal proceedings based on that conviction. The proceeding was terminated on November 28, 2001, however, because, as proof of his citizenship, Tineo produced a United States passport that was issued to him in 2001.[2]

---

[2] Some confusion exists in the record as to the status of this passport. While the NTA charges that Tineo obtained this passport by using fraudulent documents, there is no evidence to support this claim. The passport application indicates that the only documents attached as exhibits were Tineo's birth certificate, his mother's death certificate, his father's naturalization certificate, and a "memo of law," which is not in the record before us. A.R. 302.

In addition, Tineo clearly disagreed with the IJ when the IJ stated that he had "falsely represented that [he] was a [U.S.]

6

2.

The second occasion arose pursuant to an NTA issued on October 14, 2014. The NTA charged several bases for Tineo's removal, stemming from three events.[3]

First, Tineo was convicted on July 8, 2002, of the sale of a controlled substance in New York state court, thus making him inadmissible pursuant to 8 U.S.C. §§ 1182(a)(2)(A)(i)(II) and (a)(2)(C).

_____

citizen to gain entry to this country." A.R. 111. Thus, we cannot find support for the IJ's statement that Tineo admitted to obtaining this passport using fraudulent documents. While not germane to our ultimate decision, we nonetheless wish to note the lack of any evidence in the record of fraud in connection with Tineo's original passport application. As far as we can discern, the issuance of this passport in 2001 did not occur because of any fraudulent misrepresentations made by Tineo.

[3] Since, according to the government, Tineo was not admitted in 2008 when he returned to the United States from a trip abroad, the statutes cited in the NTA involve grounds for inadmissibility. Because the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 eliminated separate exclusion and deportation proceedings, creating instead a single removal proceeding, Austin T. Fragomen, et al., *Fragomen on Immigration Fundamentals: A Guide to Law and Practice* § 1:3.3[D] (PLI) (5th ed. 2019), this technicality does not impact our analysis.

Second, on January 15, 2008, upon returning to the United States after a trip abroad, Tineo presented the passport issued to him in 2001. The NTA charged that "[i]n doing so, [he] falsely represented [him]self to be a [U.S.] Citizen . . . to gain entry into the United States," thus violating § 1182(a)(6)(C)(i) and (ii). A.R. 890. The NTA also charged Tineo as being an alien present in the United States without being admitted or paroled, in violation of § 1182(a)(6)(A)(i). This violation was based on the fact that, because Tineo used a United States passport to enter the country and "U.S. Citizens are not inspected, [Tineo] entered without being admitted or paroled after inspection by an Immigration Officer." A.R. 377.

The third event providing a basis for Tineo's removal was his conviction in 2014 of passport fraud and aggravated identity theft in the Eastern District of Pennsylvania. This conviction arose when, after his passport expired, Tineo attempted to obtain a new passport using the name Luis Padilla. Tineo presented several identification documents in the name Luis Padilla in support of his passport application. Based on this conviction, the NTA charged Tineo as inadmissible, pursuant to § 1182(a)(2)(A)(i)(I).

## C. Challenges to Removal

Appearing pro se before the immigration judge, Tineo admitted to his criminal convictions, but challenged his removability on the grounds that (1) he derived citizenship through his father and (2) this was evinced by his legally obtained first passport.[4]

---

[4] Tineo also sought relief pursuant to the Convention Against Torture but did not raise that claim in his opening brief

8

1.

His derivative citizenship claim was based on former 8 U.S.C. § 1432(a),[5] which provides that:

> A *child* born outside of the United States of alien parents, or of an alien parent and a citizen parent who has subsequently lost citizenship of the United States, becomes a citizen of the United States upon fulfillment of the following conditions:

---

before this Court. It is therefore waived. *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) ("It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal.") (citations omitted).

[5] As we have noted,

> Congress repealed section 1432(a) by enacting the Child Citizenship Act of 2000 [("CCA")], § 103, [8 U.S.C. §§ 1431–33 (2001)]. The [CCA] became effective on February 27, 2001, 120 days following its enactment. Because all relevant events respecting [Petitioner]'s claimed derivative citizenship occurred prior to the [CCA]'s effective date, [§] 1432(a) controls our analysis.

*Brandao v. Att'y. Gen. of U.S.*, 654 F.3d 427, 428 n.1 (3d Cir. 2011).

9

(1) The naturalization of both parents; or

(2) The naturalization of the surviving parent if one of the parents is deceased;[6] or

(3) The naturalization of the parent having legal custody of the child when there has been a legal separation of the parents or the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation; and if

(4) Such naturalization takes place while such child is under the age of eighteen years; and

(5) Such child is residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of the parent last naturalized under clause (1) of this subsection, or the parent naturalized under clause (2) or (3) of this subsection, or thereafter begins

---

[6] Read literally, § 1432(a)(2) appears to require that first one parent has to die and then the second parent has to naturalize. But the United States Citizenship and Immigration Services ("USCIS") has determined that the order of events does not matter, so long as all events occur before the child's eighteenth birthday. *Matter of Baires-Larios*, 24 I. & N. Dec. 467, 470 (BIA 2008) (quoting Adjudicator's Field Manual, ch. 71, § 71.1(d)(2), U.S. CITIZENSHIP AND IMMIGRATION SERVICES, (Feb. 2008), http://www.uscis.gov/propub/DocView/afmid/1/172). The parties do not question this practice.

10

> to reside permanently in the United States while under the age of eighteen years.

8 U.S.C. § 1432(a) (repealed by Pub. L. No. 106-395, Title I, § 103(a), Oct. 30, 2000, 114 Stat. 1632) (emphasis added).

> The statute defines "child" as meaning:

> an unmarried person under twenty-one years of age *and includes* a child legitimated under the law of the child's residence or domicile, or under the law of the father's residence or domicile, whether in the United States or elsewhere . . . .

§ 1101(c)(1) (emphasis added).[7]

---

[7] The definition continues to also include a child adopted in the United States if, as to both adopted and legitimated children and except as otherwise provided in sections 1431 and 1432 of the title:

> such legitimation or adoption takes place before the child reaches the age of 16 years (except to the extent that the child is described in subparagraph (E)(ii) or (F)(ii) of subsection (b)(1)), and the child is in the legal custody of the legitimating or adopting parent or parents at the time of such legitimation or adoption.

§ 1101(c)(1).

The United States Citizenship and Immigration Services ("USCIS") interpreted the language beginning with "and includes" as restricting the meaning of child to exclude children born out of wedlock who were not legitimated, regardless of whether they were unmarried and under the age of 21. When Tineo filed an application for a certificate of citizenship—also known as a Form N-600—in 2007, USCIS denied his application because he was "a child born out of wedlock" and "had not been legitimated by his [U.S.] citizen father . . . ." App 4. In denying Tineo's derivative citizenship claim, the Immigration Judge (IJ) stated that "[t]he CIS denial letter [regarding the N-600 application] . . . correctly noted the law." App. 10. That is, "children born out of wedlock who have not been legitimated are not included in the definition of 'child' under the INA." App. 10.[8]

---

[8] As Tineo points out, this reading is counterintuitive and counter-textual, for it requires a tortured construction of the phrase "and includes." It also implies that a child born out of wedlock that is seeking to derive citizenship through her mother must also be legitimated under the law of her own residence or domicile or that of her father. This implication came to bear when Congress passed the CCA.

The CCA repealed former § 1432(a) and enacted § 1431(a) in its place. The new provision did away with § 1432(a)(3) such that it remained an open question as to whether § 1101(c)(1)'s legitimation requirement would extend to mothers. The White House Office of Legal Counsel examined the issue, labeled § 1101(c)(1) "poorly drafted," and outlined a number of permissible interpretations that would avoid imposing a legitimation requirement on mothers. *See*

At the time Tineo was born, the only way a child could be legitimated in the Dominican Republic was through the marriage of the parents prior to the child's sixteenth birthday. New York also required marriage of the parents in order to legitimate a child. Tineo attempted to establish that his parents, who were never legally married, had a common law marriage. He provided a letter from the Dominican Republic consulate, noting that "common-law marriage is recognized by our Supreme Court through a judgment dated October 17, 2001, in the case of a lawsuit against an insurance company due to the death of a partner." App. 11, A.R. 943. However, there was no evidence that this decision was retroactive such that it would apply to prior unions. The IJ thus determined that Tineo's parents did not have a common law marriage at the relevant time.

The Board of Immigration Appeals ("BIA") affirmed the IJ's decision. It found "no clear error in the Immigration Judge's factual finding that the respondent has not presented evidence of legitimization . . . , such that he has not established that he was a 'child' for purposes of deriving citizenship through his father." App. 6. Tineo argued that the definition of "child" "creates an unconstitutional gender-based distinction between mothers and fathers, in violation of the equal protection clause of the Constitution." *Id.* But the BIA concluded that it lacked "jurisdiction to entertain such a challenge." *Id.*

---

Eligibility of Unlegitimated Children for Derivative Citizenship, 27 O.L.C. 136 (2003).

2.

Tineo further argued that the IJ erred in not finding that he was a U.S. citizen based on the issuance of his first passport. Relying on *Delmore v. Brownell*, 236 F.2d 598 (3d Cir. 1956), *Matter of Villanueva*, 19 I. & N. Dec. 101 (BIA 1984), and *Matter of Peralta*, 10 I. & N. Dec. 43 (BIA 1962), Tineo's view was "that unless it is void on its face, a valid United States passport issued to an individual as a citizen of the United States is not subject to collateral attack in administrative immigration proceedings, but constitutes conclusive proof of such person's [U.S.] citizenship." App. 5. The BIA rejected this argument, based on new precedent from this Court in *United States v. Moreno*, 727 F.3d 255 (3d Cir. 2013). In *Moreno*, we held that "a passport constitutes conclusive proof of citizenship *only* if the passport was issued to a U.S. citizen." *Id.* at 257.[9]

## D. Petition for Review and Motion to Remand

Tineo filed a timely petition for review with this Court. In lieu of filing a brief, the government moved to remand to allow the BIA "to provide a more fulsome explanation as to what weight should be afforded a previously-valid, but expired passport in establishing citizenship." Mot. to Remand 1. The case was then stayed, pending the decision in *Sessions v.*

---

[9] We also note that our precedent in *Delmore* did not hold that a passport was conclusive proof of citizenship. Rather, we stated that "[o]nce the United States has determined that an individual is a citizen, it should be required to disprove its own determination by clear, unequivocal, and convincing evidence." *Delmore*, 236 F.2d at 600 (internal quotation marks omitted).

14

*Morales-Santana*, 137 S. Ct. 1678 (2017). Upon issuance of the Supreme Court's decision, Tineo filed a new opening brief, to which the government replied. In its brief, the government noted that it no longer believed remand was necessary since the only issues presented involved legal questions, which this Court could address without input from the BIA. In light of this admission, we deny the motion to remand.

## II. Jurisdiction and Standard/Scope of Review

### A. Jurisdiction

We have jurisdiction to decide a nationality claim under 8 U.S.C. § 1252(b)(5)(A), since "no genuine [dispute] of material fact about the petitioner's nationality is presented." *Dessouki*, 915 F.3d at 966–67 (affirming that "§ 1252(b)(5)(A) is best read as granting jurisdiction"). We also have jurisdiction to review constitutional claims under § 1252(a)(2)(D).

That Tineo's claim is premised on his father's constitutional rights is of no moment. Typically, a party has to assert his own legal rights and cannot rely on the legal rights of third parties. *Morales-Santana*, 137 S.Ct. at 1689. But, as the Supreme Court articulated,

> we recognize an exception where, as here, the party asserting the right has a close relationship with the person who possesses the right [and] there is a hindrance to the possessor's ability to protect his own interests.

*Id.* (alteration in original) (internal quotation marks omitted) (quoting *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). As

15

Felipe Tineo's son, Tineo satisfies the "close relationship" requirement, while his father's death establishes the hindrance to his father's ability to assert this claim on his own. *See id.* (considering the petitioner-child as the "obvious claimant" and "best available proponent" of the equal protection rights of his deceased father whose "failure to assert a claim in his own right stem[med] from disability, not disinterest (internal quotation marks and citations omitted)); *see also Breyer v. Meissner*, 214 F.3d 416, 423 (3d Cir. 2000) (holding that the petitioner could assert his mother's equal protection rights because "his own alleged deprivation of citizenship as a result of discrimination against his mother constitute[d] injury-in-fact, the closeness of his relationship to his mother [was] obvious, and his mother's death most definitely constitute[d] a hindrance to her assertion of her own rights").

## B. Standard and Scope of Review

Though he asks us to employ any number of mechanisms to cure the constitutional infirmity he asserts, Tineo's challenge remains that, in conjunction with the government's construction of "child," as defined in § 1101(c)(1), and the prior legitimation laws of New York and the Dominican Republic, §§ 1432(a)(2) and (a)(3) prohibited a father from transmitting his citizenship to his born-out-of-wedlock child in his care when the child's mother was deceased, while allowing similarly situated mothers to so transmit. Appellant's Op. Br. 48. Tineo's is thus a challenge to a citizenship-determining "legislation that differentiate[d] on the basis of gender," *Morales-Santana*, 137 S. Ct. at 1690, and that did so in an allegedly unconstitutional manner in his case.

1.

16

The standard of review for such a challenge is intermediate scrutiny. That is, the legislation will only withstand constitutional scrutiny if its defender shows "at least that the challenged classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Id.* (internal quotation marks and citations omitted).

This is not merely because the legislation differentiates on the basis of gender. Indeed, because of Congress's "broad power to admit or exclude [noncitizens]," statutes governing immigration benefits to noncitizens need only be supported by a rational basis, even where they differentiate on the basis of gender. *See Fiallo v. Bell*, 430 U.S. 787, 788–89, 792–96 (1977). Rather, it is also because, as was the case in *Morales-Santana*, Tineo claims that "he is" and has for some time been "a U.S. citizen." *See Morales-Santana*, 137 S. Ct. at 1693–94 (applying an "exacting standard of review" to "a claim of th[e same] order"); *see also Dent v. Sessions*, 900 F.3d 1075, 1081 (9th Cir. 2018) (overturning prior ruling that rational basis review applied even where the relevant statute governs who is and is not a citizen in light of *Morales-Santana*). The government concedes as much. *See* Resp't Br. 33.

Similar to the Ninth Circuit, we previously assessed whether "[f]ormer 8 U.S.C. § 1432's restrictions on derivative citizenship based solely on the father's naturalization [were] *rationally related*" to the reasons proffered by the government. *Catwell v. Att'y Gen. of U.S.*, 623 F.3d 199, 211 (3d Cir. 2010) (emphasis added). *Catwell* did involve the slightly different circumstance of a noncitizen challenging a citizenship-conferring statute on his own behalf, *id.* at 210 ("Petitioner

17

contends that former 8 U.S.C. § 1432(a)(3) 'unconstitutionally discriminates against [*him*] based upon legitimacy and gender.'") (quoting Catwell's Br. 53). That is enough to distinguish it from *Breyer*, which applied intermediate scrutiny where a noncitizen presented a gender-based equal protection challenge to a citizenship-conferring statute because the challenge was on behalf of his citizen parent. 214 F.3d at 423–24. But not from *Morales-Santana*. This is because, unlike *Breyer*, there is no indication that *Morales-Santana*'s application of intermediate scrutiny was premised on anything other than the fact that the petitioner's challenge was gender-based and he "claim[ed] he [was] . . . a U.S. citizen." 137 S. Ct. at 1693–94.

So we too must relent: in accordance with *United States v. Tann*, 577 F.3d 533, 541 (3d Cir. 2009), based on intervening Supreme Court precedent, this panel declines to follow our Court's precedential decision in *Catwell*. We will apply intermediate scrutiny in this case and do so because Tineo presents a gender-based equal protection challenge and claims that he is a U.S. citizen.

2.

The scope of the challenge is as-applied. This entails a concession that the statute at issue may be constitutional in many of its applications but contends "that its application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010) (citation omitted). In contrast, a facial challenge "tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case." *Id.* (citation omitted). Properly understood, Tineo's challenge turns on the particular

circumstances at hand: the statute's interaction with the New York and Dominican Republic laws and his particular family circumstances.

By contrast, many jurisdictions have abolished distinctions between legitimated and unlegitimated children or eased the burden on unwed fathers to legitimate their children. *See, e.g.*, *Brandao v. Att'y Gen. of U.S.*, 654 F.3d 427, 430 (3d Cir. 2011) (abolished in Cape Verde); *Anderson v. Holder*, 673 F.3d 1089, 1101–02 (9th Cir. 2012) (eased in Arizona). Indeed, in 2015, the BIA observed the "growing consensus—both in the United States and abroad—against labeling children []'legitimate' and 'illegitimate' by virtue of the marital status of their parents." *Matter of Cross*, 26 I. & N. Dec. 485, 492 (BIA 2015). So it eased the burden on unwed fathers in some jurisdictions by holding that, for the purposes of § 1101(c)(1), a father need not follow the formal process required to legitimate a child if that jurisdiction has eliminated all legal distinctions between "legitimate" and "illegitimate" children. *Id.*[10] Additionally, as the government points out, as early as 1940, nearly half of all states permitted a father to take some action other than marrying the child's mother in order to legitimate a child born out of wedlock. Resp't Br. 41 (citing Nationality Manual § 1041.861).

---

[10] The burden still remains in jurisdictions that maintain the distinction, since § 1101(c)(1) has not been amended.

### III. Discussion

### A. Challenge

Moving to the challenge itself, it is twofold. Tineo first asks that we avoid the constitutional question by rejecting the government's construction of "child," as defined in 8 U.S.C. § 1101(c)(1), and instead construe the provision as including anyone who is unmarried and under the age of 21. Alternatively, he asks that we deem the interplay between §§ 1101(c)(1) and 1432(a) unconstitutional as applied to his father.

1.

Section 1101(c)(1) is the linchpin of the denial of Tineo's constitutional avoidance argument. This is because § 1101(c)(1) has been interpreted to require that a child born out of wedlock must be legitimated in order to be considered a "child" as incorporated in § 1432(a). So read, it tethers legitimation to the law of the residence or domicile of the father or child. In the context of laws that only permit legitimation through marriage, then, § 1101(c)(1) causes § 1432(a)(2) to prevent a surviving father from ever transmitting citizenship to his child "if the child remained unlegitimated at the time of the mother's death." Pet'r's Op. Br. 16. Further, "[t]he father would be powerless to change this result by adopting or legitimating the child, since adoption is unavailable to biological fathers . . . ." *Id.* at 19–20. In contrast, a naturalized mother may transmit citizenship to her "child [who] was born out of wedlock and [whose] paternity . . . has not been established by legitimation." § 1432(a)(3).

20

We agree that the government's construction of § 1101(c)(1) plays a role in the alleged constitutional violation, but pinning it all on that provision in the way Tineo proposes would be strong medicine for what is an otherwise narrow infirmity.

Under the government's construction, § 1101(c)(1) merely imposes a legitimation requirement on the fathers of children born out of wedlock. While this imposition engenders a differentiation between women and men, it is akin to gender-based differentiation that has withstood constitutional scrutiny. Indeed, in *Nguyen*, the Supreme Court upheld imposing affirmative steps, including legitimation, on unwed fathers but not mothers so long as they were not "onerous" and did not create "inordinate and unnecessary hurdles to conferral of citizenship on the children of citizen fathers." *Nguyen*, 533 U.S. at 62, 65, 70–71. This is because the relation between a mother and a child "is verifiable from the birth itself," and the same is true of "the opportunity for the development of a relationship between citizen parent and child . . . ." *Id.* at 62, 65. These same biological differences led the Court to opine in *Trimble* that "[t]he more serious problems of proving paternity might justify a *more demanding* standard for illegitimate children claiming under their fathers' estates than that required for [those] claiming under their mothers' estates . . . ." 430 U.S. at 771 (emphasis added).

Assuming *arguendo* that we would be able to, construing § 1101(c)(1) in the way Tineo proposes would effectively invalidate the legitimation requirement in most instances. Rather than applying in every case in which a child is born out of wedlock and only the father naturalizes, the requirement would only apply where this was true *and* the out-of-wedlock child married or was over the age of 21. When

21

coupled with the requirement that the parent's naturalization needs to happen while the child is under eighteen years of age, *see* § 1432(a)(4), the requirement would become a shell of its former self. This effect is even broader when one considers that § 1101(c)(1) continues to play a role in the renewed § 1431(a), which also requires that the child be "under the age of eighteen years" when the parent naturalizes. § 1431(a)(2).

Regardless of the merits (or lack thereof) of imposing a legitimation requirement on the fathers of children born out of wedlock, invalidating a provision's operation in a vast number of instances across two different statutes, one of which is not at issue, is too strong a medicine for avoiding or curing the otherwise narrow infirmity Tineo has identified. Tineo's father was unable to have his born-out-of-wedlock child derive citizenship through him, whereas a similarly situated mother would have faced no such roadblock. Though § 1101(c)(1) sets the stage for this disparate treatment, § 1432(a)(2) and (a)(3) are the main acts. We therefore consider the infirmity alleged by Tineo, with due attention to how the provisions operate in concert.

2.

As we have noted in prior cases, "the standard of review . . . is often outcome determinative." *Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 213 (3d Cir. 2013). This case is no different. To survive the challenge Tineo presents, the government is required to show that §§ 1101(c)(1) and 1432(a)'s classification "serve an important governmental interest *today*." *Morales-Santana*, 137 S. Ct. at 1690. This is because, "in interpreting the Equal Protection Clause, the [Supreme] Court has recognized that new insights and societal understandings can reveal unjustified inequality . . . that once

22

passed unnoticed and unchallenged." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015) (quoted in *Morales-Santana*, 137 S. Ct. at 1690). This is a tall order for the government, as it requires justifying treating Tineo's father as being so different from a similarly situated mother of an out-of-wedlock child that Tineo's father ought to never be able to transmit his citizenship to Tineo.

Unsurprisingly, the order is too tall: the government's justification is unavailing in these circumstances.

It proffers that the classification is a tailored means by Congress to avoid "usurping the traditional province of states, and foreign countries, to regulate domestic relationships." Resp't Br. 35–36, 38. In essence, Congress wanted to "defer to states' laws on legitimacy" that "did not permit a[n unlegitimated] child to inherit from his . . . father." *Id.* at 40. This justification is tantamount to asserting that the federal government has an important interest in perpetuating discrimination under state or foreign law against the fathers of nonmarital children, a premise that is at odds with Supreme Court precedent. *See Morales-Santana*, 137 S. Ct. at 1700 n.25. As the Court observed, "[d]istinctions based on parents' marital status . . . are subject to the same heightened scrutiny as distinctions based on gender." *Id.*; *cf. Cabrera v. Att'y Gen. of U.S.*, 921 F.3d 401, 404 (3d Cir. 2019) (applying rational basis review to disparate treatment of biological and adoptive children in the context of 8 U.S.C. § 1409). Permitting the government to impose one dubious classification merely to entrench another would be absurd.

Even if this interest did not equate to the perpetuation of discrimination against unwed fathers, the government has not articulated how deferring to state legitimation rules

23

constitutes an important governmental interest "*today*." *See id.* at 1690. Although some states have not formally abolished the distinction between legitimated and unlegitimated children, these classifications now have little import under state law: long gone are the days when unlegitimated children simply could not inherit. *See, e.g.*, N.Y. Est. Powers & Trs. Law § 4-1.2(2)(C) (allowing unlegitimated children to inherit if they provide results from a paternity test or "evidence that the father openly and notoriously acknowledged the child as his own"). But, when coupled with the circumstances of Tineo's case, §§ 1101(c)(1) and 1432(a)'s legitimation rule turns these largely meaningless vestiges of a bygone era into the defining characteristic for whether naturalized fathers can ever transmit citizenship to their born-out-of-wedlock children.

Our dissenting colleague would like us to cast this reality aside because, "in legislating, Congress is not required to anticipate every potential outcome that results from the application of a statute in order for it to pass constitutional muster." Diss. Op. 5.[11] The view originates from a passage in

---

[11] To be clear, our colleague is not suggesting that Congress need not consider the Constitution when legislating. This proposition finds no support in our jurisprudence, the Supreme Court's, or that of any of our sister circuits. It is elemental that Congress cannot legislate beyond the limits set by the Constitution. *Marbury v. Madison*, 5 U.S. 137, 138 (1803) ("An act of congress repugnant to the constitution *cannot* become law." (emphasis added)). So, while it may well be true that Congress is not required to anticipate every potential outcome that results from the application of its statutes, we are obliged to hold it accountable for those applications that are unconstitutional. *See, e.g.*, *id.* at 177–78

24

*Nguyen*.  The Court had acknowledged the importance of assuring the existence of a relationship between citizen parent and child, both as a biological matter and in terms of the opportunity for a true relationship to develop between the two. *Nguyen*, 533 U.S. at 62, 65 (acknowledging that the biological relationship between a mother and child is "verifiable from the birth itself," and "likewise the opportunity for the development of a relationship between citizen parent and child").  In response, the "petitioners assert[ed] that, although a mother will know of her child's birth, knowledge that one is a parent, no matter how it is acquired, does not guarantee a relationship with one's child." *Id.* at 69.  The Court dismissed this assertion on the ground that, "even [if] one conceive[d] of the interest Congress pursue[d] as establishment of a real, practical relationship of considerable substance between parent and child in *every case*," its chosen means would "meet[] the equal protection standard . . . so long as it is *substantially related* to the achievement of the governmental objective in question." *Id.* at 70 (emphases added) (internal quotation marks and citations omitted).  It then clarified this point by explaining that the means-end fit required to survive intermediate scrutiny does not require that the means be "capable of achieving [the] ultimate objective in every instance." *Id.*

With this as the background, there is no disagreement that the existence of a relationship between citizen parent and child is an important governmental objective, particularly in the "difficult context of conferring citizenship on a vast

("[I]f a law be in opposition to the constitution [and] both the law and the constitution apply to a particular case, . . . the court must determine which of these conflicting rules governs the case.  This is of the very essence of judicial duty.").

25

number of persons." *Id.* at 70. We also agree that the means-end fit required to survive intermediate scrutiny does not mean that 8 U.S.C. §§ 1101(c)(1) and 1432(a)(2) and (a)(3) have to ensure that this relationship exists in every instance. But Tineo does not contend otherwise: he simply asks us to determine whether the means-end fit was sufficiently close when those provisions did not permit his father to transmit citizenship to him, without providing any practicable way for his father to demonstrate that the requisite relationship existed between the two.

To that effect, the Supreme Court has long recognized that "laws treating fathers and mothers differently may not be constitutionally applied . . . where the mother and father are in fact similarly situated with regard to their relationship with the child." *Morales-Santana*, 137 S. Ct. at 1693 n. 12 (2017) (alteration in original) (internal quotation marks omitted) (quoting *Lehr v. Robertson*, 463 U.S. 248, 267 (1983)). It thus saw no equal protection problem where an unwed father who "ha[d] never supported and rarely seen" his child complained that he was entitled to receive notice of a proceeding to adopt her. *Lehr*, 463 U.S. at 250. The Court concluded that "the New York statutes adequately protected appellant's inchoate interest in establishing a relationship with [his daughter]," and thus found "no merit in the claim that his constitutional rights were offended." *Id.* at 262–65; *see also Morales-Santana*, 137 S. Ct. at 1693 n.12 (explaining that "[t]he 'similarly situated' condition was not satisfied in *Lehr*, [because] the father in that case had 'never established any custodial, personal, or financial relationship' with the child"). Notably, the statutes provided that the father would have been entitled to notice had he done any one of the following: (1) filed his name in the state's putative father registry, (2) established paternity by

26

adjudication, (3) been identified as the child's father on her birth certificate, (4) openly lived with the child's mother and held himself out to be her father, (5) identified as the father in a sworn statement, or (6) married the child's mother before she turned six months old. *Id.* at 251.

Tellingly, the Court took the opposite view with an Illinois statute that outright terminated the custody rights of an unwed father who had "lived with his children all their lives and had lived with their mother for eighteen years," and thereby rendered "the nature of the actual relationship between parent and child . . . *completely* irrelevant." *Lehr*, 463 U.S. at 258–59. (emphasis added) (referring to *Stanley v. Illinois*, 405 U.S. 645, 655 (1972)). Specifically, the statute permitted the state to "circumvent neglect proceedings on the theory that an unwed father [was] not a 'parent' whose existing relationship with his children must be considered." *Stanley*, 405 U.S. at 649–50. As the Court put it, such a law "*conclusively presumed* every father of a child born out of wedlock to be an unfit person to have custody of his children." *Lehr*, 463 U.S. at 258 (emphasis added). The Court found this "constitutionally repugnant," because even if "most unmarried fathers are unsuitable and neglectful parents . . . some are wholly suited to have custody of their children," and the "State readily concede[d]" that there was no evidence that the father "[was] or ha[d] been a neglectful father who ha[d] not cared for his children." *Stanley*, 405 U.S. at 649, 654–55.

Nothing in *Nguyen* suggests that the Court has departed from this course. Like the New York statutes in *Lehr*, 8 U.S.C. § 1409(a)(4) imposed what the Court characterized as a "minimal" burden on unwed fathers to demonstrate the existence of a relationship with their child as a prerequisite for transmitting citizenship. *Nguyen*, 633 U.S. at 70. The father

27

could take the "*least onerous* of . . . the[] *simple* steps and alternatives" of legitimating the child under the law of the child's residence or domicile, acknowledging paternity in writing under oath, or establishing paternity by adjudication of a competent court. *Id.* at 59, 69–71 (emphases added). In contrast, the burden imposed on Tineo's father to demonstrate the existence of a relationship to Tineo was not only onerous, it was impossible. Indeed, like Stanley, the actual relationship between Felipe Tineo and his child was rendered completely irrelevant, and he was conclusively presumed to be unfit to transmit citizenship to his child.

We thus maintain that, when applied to his circumstance, the provisions from which such a burden and presumption stem—§§ 1101(c)(1) and 1432(a)(2) and (a)(3)— cannot be squared with the equal-protection mandate of the Due Process Clause of the Fifth Amendment.

## B. Remedy

Anticipating this result, the government suggests that we "should not fashion a remedy and, instead, leave that work to Congress." Resp't Br. 48. In so suggesting, the government advances the view that we do not have the "power to provide relief of the sort requested in this [petition]—namely, conferral of citizenship on a basis other than that prescribed by Congress." *Morales-Santana*, 137 S. Ct. at 1701 (Thomas, J., joined by Alito, J., concurring in part) (internal quotation marks and citations omitted). We do not subscribe to this view. *See Breyer*, 214 F.3d at 429 (finding an equal protection violation in a derivative citizenship statute, and providing that, pursuant to additional findings by the District Court, the noncitizen petitioner would "be entitled to American citizenship relating back to his birth").

As an initial matter, a judgment in Tineo's favor "would confirm [his] pre-existing citizenship rather than grant [him] rights that [he] does not now possess." *Miller v. Albright*, 523 U.S. 420, 432 (1998) (opinion of Stevens, J.). Or, more precisely, what Tineo seeks is "severance of the offending provisions so that the statute, free of its constitutional defect, can operate to determine whether citizenship was transmitted" by his father. *Nguyen*, 533 U.S. at 95–96 (O'Connor, J., dissenting) (citing *Miller*, 523 U.S. at 488–89) (Breyer, J., dissenting)); Oral Arg. Audio 9:38–10:04. Indeed, as long ago as 1898, the Supreme Court invalidated the application of the Chinese Exclusion Act to a man born in the United States and who therefore, under the Fourteenth Amendment, had been a citizen since birth. *See United States v. Wong Kim Ark*, 169 U.S. 649, 704 (1898).

More to the point, the view espoused by the government has never commanded a majority of the Supreme Court, and, in fact, as the authoring Justice Scalia bemoaned, "[a] majority of the Justices . . . concluded otherwise in" *Miller* and "the Court . . . proceed[ed] on the same assumption" in *Nguyen*. *Nguyen*, 533 U.S. at 73–74 (Scalia, J., joined by Thomas, J., concurring) (concluding that it was thus "appropriate . . . to reach the merits of petitioners' equal protection claims [and] join the opinion of the Court").

The principal case cited by the government—*INS v. Pangilinan*, 486 U.S. 875, 883 (1988)—does not convince us otherwise. That case involved the judicial conferral of citizenship as an equitable remedy where there was no finding that the statute was constitutionally infirm. Section 701 of the 1940 Nationality Act provided an avenue by which noncitizens who served in World War II could naturalize without having to meet a residency or English-proficiency requirement. *Id.* at

29

877–88.  That pathway presumed that a representative would be designated to receive petitions, conduct hearings, and grant naturalizations overseas.  *Id.* at 878.  For foreign-policy reasons, the Attorney General deprived the Philippine Islands of such a representative for a nine-month period.  *Id.* at 879–80.  This led to a stream of litigation by Filipino veterans who did not naturalize before the 1940 Act expired.  *Id.* at 880.  Two cases made it to the Ninth Circuit and were consolidated.  *Id.*  The Ninth Circuit held that the deprivation of a representative in the Philippines violated the mandate of the 1940 Act and awarded an equitable remedy by retroactively conferring citizenship.  *Id.* at 882.  The Supreme Court reversed because, like the doctrine of equitable estoppel, equitable remedies cannot "override a public policy established by Congress . . . ."  *Id.* at 883 (internal quotation marks and citation omitted).  That is, "the power to make someone a citizen of the United States has not been conferred upon the federal courts, like mandamus or injunction, as one of their *generally applicable equitable powers.*"  *Id.* at 883–84 (emphasis added).

That statement and holding have no bearing where the Constitution is concerned.  *See Nguyen*, 523 U.S. at 95–96 (O'Connor, J., joined by Souter, Ginsburg, and Breyer, JJ., dissenting).  In that instance, the notion that a court is not empowered to fashion a remedy finds support in only an exceedingly strict view of the plenary power doctrine.  *See Miller*, 523 U.S. at 455–56 (Scalia, J., concurring in the judgment) ("It is in my view incompatible with the plenary power of Congress over those fields for judges to speculate as to what Congress would have enacted if it had not enacted what it did . . . .").  It was not too long ago that a similarly strict treatment of this doctrine resulted in the condonation of even the most blatant discrimination.  *See, e.g.*, *The Chinese*

30

*Exclusion Case*, 130 U.S. 581, 610–11 (1889) (establishing the modern plenary-power doctrine in upholding the Chinese Exclusion Act); *Fong Yue Ting v. United States*, 149 U.S. 698, 732, 13 S. Ct. 1016, 1017 (1893) (holding that the political branches could deport residents based solely on their race and deem all people of "the Chinese race" incompetent to sign the affidavit needed for Chinese immigrants to remain lawfully); *id.* at 763 (Fuller, J., dissenting) (castigating the majority's decision as "incompatible with the immutable principles of justice, inconsistent with the nature of our government, and in conflict with the written constitution by which that government was created, and those principles secured"); *Boutilier v. INS*, 387 U.S. 118, 122–24 (1967) (holding that Congress could deem gay men excludable "as afflicted with a . . . psychopathic personality" under the plenary-power doctrine).

Unsurprisingly, then, while continuing to recognize the broad deference owed to Congress in immigration matters, the Supreme Court has in recent years curtailed the plenary-power doctrine's excesses, both by clarifying that rational-basis review still adheres upon its invocation and by limiting the classes of persons subject thereto. *See, e.g.*, *Morales-Santana*, 137 S. Ct. at 1693–94; *INS v. Chadha*, 462 U.S. 919, 940–41 (1983) (rejecting the government's invocation of the plenary-power doctrine because the case concerned "whether Congress has chosen a constitutionally permissible means of implementing that power"). We, too, have recognized that the plenary-power doctrine—while affording Congress great discretion—"is subject to important constitutional limitations," and "it is the province of the courts" to enforce those constraints. *Osorio-Martinez v. Att'y Gen. of U.S.*, 893 F.3d 153, 175 (3d Cir. 2018) (quoting *Zadvydas v. Davis*, 533 U.S.

678, 695 (2001)) (holding that children with special immigrant juvenile status may invoke the Suspension Clause).

That curtailment is further apparent from the Court's remedy analysis in *Morales-Santana*. After finding an unconstitutional infirmity with the provisions at issue, the Court engaged in precisely the sort of "speculat[ion] as to what Congress would have enacted if it had not enacted what it did" Justice Scalia cautioned against in his concurrence in *Miller*. The equal protection infirmity at issue was that the statute retained a longer physical-presence requirement for unwed citizen fathers to transmit citizenship to their children born abroad to a noncitizen mother than for similarly situated unwed citizen mothers. *Morales-Santana*, 137 S. Ct. at 1698. The petitioner asked the Court to extend the benefit of the shorter physical-presence requirement to the unwed fathers that the statute reserved for the unwed mothers. *Id.* The Court expressly stated that it had the option of doing just that or nullifying the benefit reserved for the unwed mothers such that both classes of parents would have a longer physical presence requirement. *Id.* Despite acknowledging that "extension, rather than nullification, is the proper course" it chose nullification because extension would have disrupted the statutory scheme in a way that would have meant a shorter physical-presence requirement for unwed fathers and mothers than for their wed counterparts. *Id.* at 1700.

To our case, then, the "proper course" is proper. Indeed, we are confronted with the same two remedial alternatives: we can remedy the unequal treatment by extending the benefit that 8 U.S.C. § 1432(a)(3) confers on unwed mothers to Felipe Tineo or by nullifying the benefit such that the benefit-conferring clause in (a)(3) is excised. We choose the former, and our choice is "governed by the legislature's intent, as

revealed by the statute at hand." *Morales-Santana*, 137 S. Ct. at 1699.

Gleaning that the proper course is extension is rather straightforward in this case. On the one hand, nothing supports nullification. This is because in the face of nullification—that is, the possibility that § 1101(c)(1) could be read as imposing a legitimation requirement on mothers of children born out of wedlock—Congress spoke in as clear a manner as it could. It said "a child born outside of the United States of [noncitizen parents] . . . becomes a citizen [upon the] . . . the naturalization of the mother if the child was born out of wedlock and the paternity of the child has not been established by legitimation . . . ." § 1432(a)(3). Even in the absence of this provision, the government has maintained that no such legitimation requirement exists for mothers. *See* Eligibility of Unlegitimated Children for Derivative Citizenship, 27 O.L.C. 136 (2003); Memorandum of William Yates, Acting Assoc. Dir., CIS, to Regional Directors, CIS (Sept. 26, 2003), 2003 WL 22334606, at *1.

On the other, there is no roadblock to granting extension. There is little support for the view that Congress intended that no unlegitimated child born out of wedlock would ever derive citizenship through her father. Even if it did, its enactment of a severability provision counsels against considering that conviction as so strong as to warrant depriving similarly situated mothers of the benefit in order to implement it. *See* The Immigration and Nationality Act of 1952 § 406, 66 Stat. 163, 281 ("If any particular provision of this Act, or *the application thereof to any person or circumstance, is held invalid*, the remainder of the Act and *the application of such provision to other persons or circumstances shall not be affected thereby*." (emphases added)).

33

In addition, contrary to the government's suggestion, *Morales-Santana* is no obstacle. The Court's reluctance to grant extension in *Morales-Santana* was driven by the fact that it would result in ascribing a discriminatory intent to Congress: that of "disadvantageous treatment of marital children in comparison to nonmarital children." 137 S. Ct. at 1700. There is no argument that § 1101(c)(1)'s legitimation requirement applies, or has ever applied, to the parents of children born in wedlock. Thus, extending Felipe Tineo the same treatment that § 1432(a)(3) affords to similarly situated mothers would not disrupt the statutory scheme in any significant way, nor will it result in ascribing a discriminatory intent to Congress.

So we will: Jose Francisco Tineo became a U.S. citizen when his father naturalized and he was "under the age of eighteen years" and "residing in the United States pursuant to a lawful admission for permanent residence . . . ." *See* § 1432(a)(4) & (a)(5). That is since June 15, 1985.

\* \* \* \* \*

We acknowledge that, like Morales-Santana before him, Tineo does not engender much sympathy. He had other options available to seek citizenship in his own right. *See*, *e.g.*, 8 U.S.C. § 1427. Although "[t]his option [might have] be[en] foreclosed to [Tineo], [] any bar [would have been] due to the serious nature of his criminal offenses, not to an equal protection denial or to any supposed rigidity or harshness in the citizenship laws." *Nguyen*, 533 U.S. at 71.

But he is not the Tineo that is our focus here. The result fostered by the gender classification at issue precluded Felipe Tineo from ever having his child derive citizenship from him. No matter how we attain it, the Constitution guarantees us the

34

rights and responsibilities that come with American citizenship, regardless of gender, religious beliefs, or the color of our skin. *See J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 146 (1994). Felipe Tineo acquired citizenship and lived out its responsibilities, so we cannot lend our imprimatur to his being unconstitutionally denied one of its benefits. This is the focus of Jose Tineo's challenge, and the lens through which we view him an American.

With this ruling, the consequence for Tineo's offenses is not removal, but rather what the law provides is permissible for any other citizen who is convicted of the same offenses. We will therefore grant the petition for review and vacate the order of removal. This course obviates the need to reach Tineo's argument that the BIA should have found that his passport established a presumption of citizenship that the government may rebut only by showing that the passport was fraudulently or illegally obtained. *See Dessouki*, 915 F.3d at 967 (citizenship finding mooted "lingering agency issues").

SMITH, *Chief Judge*, concurring in part and dissenting in part.

When Felipe Tineo became a naturalized United States citizen, he acquired all the rights that adhere to that status.  At the relevant time, this included the right to pass his citizenship to his children under the circumstances described in 8 U.S.C. § 1432.[1]  Because we address the claim that Felipe Tineo would have been able to pass his citizenship to his son José pursuant to § 1432 but for a gender-based classification preventing it, I concur with the majority that we apply intermediate scrutiny in conducting our review.[2]  *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017).  Intermediate scrutiny requires that the

---

[1] For simplicity, I refer only to § 1432.  However, as the majority correctly observes, the gender-based classification at issue arises from the interaction of two subsections of § 1432 with the definition of "child" in 8 U.S.C. § 1101(c)(1).

[2] I likewise concur with the majority in its view that, to the extent *Catwell v. Attorney General*, 623 F.3d 199, 211 (3d Cir. 2010), applied rational basis review to a gender-based equal protection challenge, we must decline to follow it in light of the Supreme Court's more recent decision in *Sessions v. Morales-Santana*, 137 S. Ct. 1678, 1689 (2017).

1

gender-based classification serve an important governmental objective and be substantially related to achievement of that objective. *Id.* at 1690. I part ways with the majority because, in my view, § 1432 satisfies that standard.[3]

The Government posits that § 1432 serves an important governmental objective: as in *Nguyen v. INS*, 533 U.S. 53 (2001), the statute utilizes legitimation "as a tailored means of ensuring that only those unwed fathers who had achieved equal parental rights as those afforded to mothers under the law of their state or country were permitted to pass citizenship to their child." Resp't. Br. 35–36.

Recently, in *Morales-Santana*, the Supreme Court reaffirmed that it correctly decided *Nguyen*. In *Nguyen*, the parental acknowledgement requirement served the important interest of establishing "the parent's filial tie to the child." *Morales-Santana*, 137 S. Ct. at 1694. The Supreme Court described the parental acknowledgement requirement as "a justifiable, easily met means of ensuring the existence of a biological parent-child relationship, which the mother establishes by giving birth." *Id*.

---

[3] I further agree with the majority that, under *United States v. Moreno*, 727 F.3d 255, 257 (3d Cir. 2013), Tineo's first passport does not constitute conclusive proof of citizenship.

2

*Nguyen* recognized two important interests that are served in establishing the existence of such a filial tie: (1) the importance of assuring the existence of a biological father-child relationship; and (2) the importance of developing a true interpersonal relationship between the child and the citizen parent who, in turn, has ties to the United States. *Nguyen*, 533 U.S. at 62–65. The differential treatment of mothers and fathers is based upon genuine differences at the time of the birth of a child, and does not rely on outdated stereotypes. *See Nguyen*, 533 U.S. at 68 ("There is nothing irrational or improper in the recognition that at the moment of birth . . . the mother's knowledge of the child and the fact of parenthood have been established in a way not guaranteed in the case of the unwed father. This is not a stereotype.").

The legitimation requirement in § 1432, like the parental acknowledgment requirement in *Nguyen*, is substantially related to the goal of ensuring that a naturalized father's citizenship passes automatically to his child only in those cases where a genuine biological and familial tie exists. "It is almost axiomatic that a policy which seeks to foster the opportunity for meaningful parent-child bonds to develop has a close and substantial bearing on the governmental interest in the actual formation of that bond." *Nguyen*, 533 U.S. at 70. The fit between the means and the important end is, as in *Nguyen*, "exceedingly persuasive." *Id.*

3

Section 1432 is actually more difficult to satisfy than the statute in *Nguyen* because § 1432 is limited to legitimation under local law, while the statute in *Nguyen* permitted paternal acknowledgment via two additional methods (a court order of paternity or a declaration of paternity under oath). *See Nguyen*, 533 U.S. at 70–71. In my view, this does not change the conclusion that *Nguyen* applies. Even if § 1432 had included the other alternatives described in *Nguyen*, none of them would be available to José Tineo because there is no evidence that his father acknowledged paternity or adjudicated paternity before José turned 18. Moreover, as observed in *Nguyen*, José Tineo could have sought citizenship in his own right, were it not for his having committed serious criminal offenses. *See Nguyen*, 533 U.S. at 71.

It need hardly be pointed out that we are not permitted to override the will of Congress and select other methods for designating the recipients of derivative citizenship. Indeed, in *Nguyen*, the Supreme Court rejected the suggestion that a DNA test should suffice, observing that the "Constitution . . . does not require that Congress elect one particular mechanism from among many possible methods of establishing paternity." *Nguyen*, 533 U.S. at 63. Our review is limited to consideration of whether Congress's selection of state legitimation law is substantially related to its goal of establishing the existence of a true filial tie before

4

citizenship may pass from a father to his non-marital child. As I see it, such a substantial relationship exists.

The majority is swayed by the outcome that José Tineo is forever barred from receiving derivative citizenship via his naturalized father because his mother died when José was 15, and the laws of the relevant jurisdictions (New York and the Dominican Republic) offered no method for Felipe to legitimate José after her death. For that reason, the majority dismisses the Government's primary justification for the statute. But in legislating, Congress is not required to anticipate every potential outcome that results from the application of a statute in order for it to pass constitutional muster. *See Pierre v. Holder*, 738 F.3d 39, 53–54 (2d Cir. 2013). Congress legislated in the "difficult context of conferring citizenship on vast numbers of persons." *Nguyen*, 533 U.S. at 70. We should therefore accept the means Congress chose, so long as it does so within the bounds of the constitution by legislating "in substantial furtherance of important governmental objectives." *See id.* I believe its chosen course meets that test.[4]

---

[4] In dismissing the government's proffered justification, the majority relies on decisions about the termination of parental rights. In *Lehr v. Robinson*, 463 U.S. 248, 266–68 (1983), for instance, the Supreme Court upheld a New York law that prevented a biological father from vetoing

his daughter's adoption by another man. *Lehr*, in turn, cites *Caban v. Mohammed*, 441 U.S. 380, 389 (1979), a case in which the Supreme Court rejected an earlier version of the same New York statute because it too broadly assumed that a father always has a lesser bond than a mother. In *Caban*, the statute was structured in a way that did not take into account the father's relationship with his biological child at all, and instead relied exclusively on "overbroad generalizations" about a non-marital father's role. *Id.* at 394. Thus, *Caban* concerned the sort of outdated gender stereotypes that do not underlie the legislation before us today. And, after *Caban*, the New York legislature amended the statute to provide methods for an unwed father to establish the existence of a relationship with his child. *See* Practice Commentary, N.Y. Dom. Rel. Law § 111 (McKinney 2016). It was the amended statute that survived scrutiny in *Lehr*.

Here, in contrast to *Lehr* and *Caban*, Congress was not addressing the termination of parental rights in adoption, but was legislating to ensure the existence of the father's filial tie for the specific purpose of passing on a citizenship right. The Supreme Court spoke to this important interest in *Nguyen* and upheld an analogous provision as constitutional because it substantially served that important interest. *Nguyen*, 533 U.S. at 67. In short, *Lehr* and *Caban* arose in a distinct and distinguishable context and do not undermine my conclusion that *Nguyen* controls.

Equal protection does not require that "the statute under consideration must be capable of achieving its ultimate objective in every instance." *Id*. Thus, although the result in the case we confront is that José Tineo cannot acquire derivative citizenship under § 1432, such an outcome does not mean that his father was deprived of the equal protection of the law.

I therefore would deny the petition for review.